Filed 4/8/25  In re Baby Boy A. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re BABY BOY A., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>　　Plaintiff and Respondent,<br>v.<br>R.A. et al.,<br>　　Defendants and Appellants. | A170346, A170829<br><br>(Contra Costa County Super. Ct. No. J21-00561) |

Appellants R.A. (Mother) and Mark E. (Father) made significant strides overcoming the personal struggles that led to the removal of their infant son.  On the eve of a hearing to select a permanent plan for the minor, both parents sought the return of the minor to their care, and Mother asked in the alternative that she be provided with reunification services after previously having been bypassed.  After several days of testimony, the juvenile court denied their requests, and it later terminated both parents' parental rights.  In these consolidated appeals, Mother and Father seek to set aside the juvenile court's rulings.  Although it is beyond dispute that the

1

parents made tremendous efforts and love their son, we cannot conclude that the juvenile court erred.  We therefore affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

### A.  *Early Case History.*

This court set forth the initial factual and procedural background of these proceedings in its opinion denying the parents' petitions for extraordinary writ review after the juvenile court terminated Father's reunification services and scheduled a selection-and-implementation hearing. (*Mark E. et al. v. Superior Court* (Nov. 2, 2023, A168455) [nonpub. opn.]. (*Mark E. I*))  We briefly summarize them here.

Both Mother and the minor (Mother's ninth child) tested positive for amphetamine and THC when the minor was born in December 2021.  That same month, respondent Contra Costa Children and Family Services Bureau (Bureau) filed a juvenile dependency (Welf. & Inst. Code, § 300)[1] petition alleging that both parents had serious substance-abuse problems that impaired their ability to care for the infant.  The parents had been homeless until around the time the minor was born, when they secured a hotel room provided by a homeless-assistance organization.  The minor was ordered detained.  He was placed in a foster home in February 2022, where he remained throughout the proceedings below.  His caregiver refers to him by a different name from what his parents call him, apparently because he had not been legally named when he was placed with the foster parent.

The Bureau first recommended that neither parent receive reunification services based on previous termination of reunification services

_____

[1] All statutory references are to the Welfare and Institutions Code.

2

and the termination of parental rights as to older siblings and half-siblings (§ 361.5, subd. (b)(10) & (11)) but ultimately recommended that Father receive them because he made efforts to achieve sobriety and care for the minor.

At a jurisdictional hearing held in April 2022, the juvenile court sustained allegations that the minor was a child described by section 300, subdivision (b) (failure to protect) based on allegations about Mother's serious substance abuse. It further sustained allegations that the minor was described by section 300, subdivision (j) (abuse of sibling) based on allegations that both parents failed to reunify with several of the minor's older siblings. The court adjudged the baby a dependent minor and placed him in out-of-home care. And it ordered reunification services for Father but bypassed them as to Mother.

Father entered an in-patient treatment program in July 2022 but had left by the time a status-review report was filed in October because he tested positive for an opiate. When the social worker contacted a services organization in October regarding Father's housing search, Father's case manager reported he had not heard from Father since July. Father did participate in eight sessions of play therapy between June and September to support his attachment to his son, and the baby appeared to make progress in feeling comfortable in Father's care. An assessment revealed that Father had ongoing auditory and visual hallucinations as well as nightmares. He was prescribed medication but stated he did not always take some of them.

Mother gave birth to another boy (younger brother) in late October 2022, and the baby was placed in the same foster home as the

minor.[2]  The following month, Mother entered a drug-treatment program, and she graduated the following fall.

Also in October 2022, the Bureau recommended that Father's reunification services be terminated because although he had taken some initial steps toward obtaining sobriety, his compliance with his case plan was "minimal[]."  A six-month review hearing was scheduled for December 2022 but, because of various continuances, the matter was ultimately held as an 18-month review hearing in August 2023.  During this time, Father made progress in his efforts to reunify, but the Bureau never recommended that his services be extended.  In a June 2023 review report, the Bureau recommended terminating reunification services and scheduling a selection-and-implementation hearing.  The report acknowledged that Father had made progress in his case plan but noted that he had not graduated from his treatment program, and he appeared reactive and defensive regarding the proceedings.

At the August 2023 review hearing, the juvenile court terminated Father's reunification services and scheduled a selection-and-implementation hearing.  Both parents petitioned this court for extraordinary writ review, but this court rejected their arguments that the juvenile court erred when it declined to extend reunification services for Father.  (*Mark E. I*, *supra*, A168455.)

Up until around this point, Mother had visited with the minor a total of 40 times out of 66 scheduled visits, and Father had visited with the minor a

---

[2] A separate dependency proceeding was initiated for the younger brother.  This court took judicial notice of a status review report and minute order entered in the younger brother's case.  The juvenile court in January 2024 granted continued reunification services for the parents in that separate case and scheduled an 18-month review hearing.

total of 106 times out of 143 scheduled visits. The parents attended 23 visits together, but after conflict arose between the parents during visits they started to visit separately with the minor. The visits were again changed so that the baby brother could be included. Father also participated in dyadic therapy sessions with the minor.

### B. Parents Seek Change in Court Order (§ 388).

Around a month after this court issued its opinion, and around the time the selection-and-implementation hearing previously had been scheduled, both Father and Mother filed requests to change court orders (§ 388, "section 388 petition"). Father's petition represented that he had secured permanent housing and was successfully transitioning through a recovery program, and he asked that his son be returned to his care. Mother's petition represented that she had been clean and sober for 13 months, and she asked that the minor be returned to her care or in the alternative that she receive reunification services. The court first ordered a hearing on Father's request, then ultimately decided to handle the petitions together.[3]

The same day the juvenile court began a hearing on the section 388 petitions, the Bureau filed a report again recommending that the court terminate the parents' parental rights, and it further recommended that adoption be selected as the permanent plan for the minor. The minor had been living with the prospective adoptive parent for most of his life and looked to that person for emotional support, care, and love. The minor called her "mama," whereas he did not refer to Mother this way. According to the

---

[3] Also around this time, the minor's caretaker applied for de facto parent status, and the juvenile court granted the request.

5

social worker, the minor's visits with his parents were "no more than playdates," and he sought out his foster parent during and after visits.

The minor reportedly had gross-motor delay and had been referred for an evaluation. He also had been referred for speech and language therapy because of language delays. It was also recommended that the minor be evaluated for possible autism, though assessments revealed he was not on the autism spectrum. The minor was, though, diagnosed with an unspecified trauma-and-stressor disorder.

A hearing on the section 388 petitions began in January 2024. Father testified about the steps he was taking to maintain sobriety. He had graduated from a drug-treatment program, and he attended three types of 12-step programs each week and met once a week with a counselor. He also had a relapse-prevention plan that included meditation, church, and daily recovery-related reading. Father explained that he previously was in denial about why his children had been taken into protective custody, but he had learned to accept his role in their removal and the effect that his prior drug use had had on his children. He further testified that he had been sober and drug-free for more than two years, and he had secured housing. He was working as a maintenance worker at his recovery program. Father testified that he had two sisters who were part of his support network and who would help him care for the minor if necessary. He also described his positive visits with the minor and the younger brother.

When asked why he believed granting custody of the minor to him would be in the minor's best interests, Father testified, "I just believe that he should be with his parents. . . . [H]e will have a place, he will be safe, he will be put in proper day care." Father further testified that "it's religious to me. It's very spiritual. Um, I think God wants us to have a family." He also

6

testified, "I will fight to the finish for my children[] and do anything that the Court asks me, anything that the doctors ask me to do for my children, any kind of autism, any kind of physical, mental therapy.  Whatever they need, I would do for my children."

Father also testified that he supported a transition plan because he would not want "to just rip my kids away" from their current caregiver, but that "I think he should be with his dad, you know."  Father knew that the minor attended special classes for sensory skills and vision issues, and he testified he had taken a class for parents of children with special needs, and he was capable of taking the minor to appointments.  He planned to have Mother live with him in the housing he had secured.  By the conclusion of the hearing on the section 388 petitions, Father had moved into a two-bedroom townhouse and equipped it with items to keep it safe for young children, such as anti-lock cabinets.  He furnished it with two beds for the minor and younger brother: a Mickey Mouse bed for the minor based on his interests and a race car bed for younger brother based on his interests.

Father acknowledged on cross-examination that he had never spent time alone with the then two-year-old minor.  The longest amount of time he had spent with him was when he was having two-hour, twice weekly supervised visitation.  At the time of the hearing, he was having two-hour supervised visits with the minor once a week.  And although he considered both of his children to have special needs, he was not necessarily familiar with all of the minor's assessment results or care providers.

Mother testified that she had been clean and sober for over 15 months, her longest period of sobriety in her adult life.  She described the positive experiences she and the minor had during their supervised visits.  She further testified that she had completed a six-week parenting class for

parents of children with special needs. Mother was currently living at a sober-living program and planned to move in and coparent with Father,[4] who she described as a "good friend[]" with whom she was "in a courtship." She testified she was requesting reunification services because she "want[ed] to be back in [her] son's life." She said she had "changed so much since when [she] was in [her] active addiction," and she was currently able to care for the minor's needs. She acknowledged on cross-examination that she had never had custody of the minor and had never had unsupervised visits with him. And during her current period of sobriety, Mother had not lived outside of a sober-living environment.

Father's niece testified that she would love to be part of the minor's life and would be available to babysit. She said it was "making [her] heart happy to know that [Father] is not in the streets with the drugs anymore, he is ready to take on a new life with his kids and make a journey, and I think that he can do it, and I know he can, and I am just so proud to see him shining like he is now." The niece had known Mother for around four years and had observed she was like a different person after getting sober and that "her whole aura has changed."

The adoptions social worker assigned to the case also testified. Her primary role was to find a permanent home for the minor, but she also supervised visitation between the minor and his parents. She testified that visits between Mother and the minor were generally "very quiet," but that Mother engaged with the minor and played with him. When Mother and Father had joint visits, Mother "t[ook] a back seat to [F]ather," who "is a big presence in the visits," "is very talkative," and "has lots of energy." The social

---

[4] Mother had moved in with Father by the conclusion of the hearing on the section 388 petitions. Both of their names were on a five-year lease.

8

worker became concerned during a visit involving both parents and both children, when the younger brother crawled to the minor and tried to grab his older brother's hair. Mother "immediately started hitting [younger brother's] hand away, slapping his hand away," prompting Father to admonish her that younger brother did not understand and that it was unacceptable for Mother to hit him. At another visit, the social worker was concerned that Father gave the minor a french fry without cooling it, which burned the minor's mouth. The minor had a habit of relying on a pacifier during visits as a response to becoming overstimulated and dysregulated.

Before issuing its ruling, the juvenile court "commend[ed] both of the parents for the strides that [they] ha[d] made." The court told the parents that "I just wanted to recognize you both and extend my congratulations to both of you on how you have handled your journeys towards sobriety thus far." But the court was concerned that Father did not appreciate how challenging it would be to have the minor (as well as the younger brother) in his care. The court was further concerned about the parents' relationship and what effect the sobriety of one parent had on the other, as well as how they might co-parent together since some testimony indicated that they were not "on the same page." The court observed that it was only recently that the parents' sobriety was "being tested outside of a controlled environment." And the court also noted that Mother's "entire history with drug usage has been overshadowed by that aspect of their relationship, and they have yet to address any co-dependency issues; so I have no evidence upon which to rely, to suggest that either parent would be willing to cut the other one off it they recognized signs of drug usage." The court said it had considered exercising its discretion to provide six months of services to Mother, but it ultimately concluded that there were no exceptional circumstances that would support

9

granting those services. The court explained that "I am not exercising that discretion because of just how young [the minor] is and how long permanency has already been delayed, and the fact that [the] parents have been on notice of many of the issues that I have raised for some time, and have yet to address them. And so I do not have confidence that they would be able to address them in an expeditious manner which is what [the minor] deserves."

The court denied the parents' section 388 petitions. It concluded that they had established some changes in circumstances, but that the parents "ha[d not] addressed their co-dependency issues or prepared sufficiently to bolster their individual sobriety, given the backdrop of so much time struggling with addiction, or that they are prepared to take on [the minor]." And the court also concluded that it would not be in the minor's best interest to grant the petitions. Both parents appealed (No. A170346). Both parents continued to visit with the minor.

### C. Termination of Parental Rights.

The selection-and-implementation hearing began in May 2024. The Bureau continued to recommend that the parents' parental rights be terminated and that adoption be selected as the permanent plan for the minor. The adoptions social worker testified about visits between the parents and the minor. When asked by Mother's counsel whether the minor was engaged and willing to play with the parents, the worker testified, "Yeah. He's always willing to play with anybody." As for Father, the adoptions worker testified that "he does really well . . . in engaging" and that he and the minor both love music. The minor sometimes dances and sings to beatbox songs that Father makes on his tablet computer, and he also laughs in Father's company and seeks him out for comfort. The minor also hugs Father when asked to do so. But the worker also described a recent experience when

10

the minor became "very d[y]sregulated" after a visit with the parents and had a hard time adjusting in school afterward and showed physical signs of stress. In general, the minor was "ready to go" at the end of visits and did not show signs of distress when it was time to leave. This contrasted with his reaction when he separated from his foster mother before visits, when he would become clingy and have trouble separating from her.

A social caseworker assistant who had also observed visits with the minor testified that the visits were positive, and that the parents hugged the minor and told him they loved him. When asked if the minor appeared to know who his parents were, the caseworker testified, "There is a recognition because of the repetitiveness of the visits. I cannot speak to how the child would identify each person. But 'have I seen you before' and 'I am familiar with you,' yes."

Mother testified in June 2024 that she continued to be sober. She had visited with the minor and younger brother earlier in the day, and the minor referred to her as "Mommy" and to Father as "Daddy." Mother felt it would be in the minor's best interest for a guardianship to be established because she "still ha[d] that maternal bond, I feel, with him," and the minor "recognize[d her] as Mommy. He knows I am his momma. And I still feel close to him. I have been having several meetings or visits and it's been going good and we've been bonding, I believe."

Father testified that in his recent visits with the minor, the minor was "way more funnier, and he shows me all these new things like the splits and all the little dances he does. He likes to jump on me and he wants me to fly him around and stuff." The minor referred to Father as "Dad and Daddy," and they had "a great bond." They enjoyed making music together, and Father explained, "That's our culture, rap music, hip hop, stuff like this. . . .

11

That's a separate culture from the daycare or the foster parent. I don't think they beatbox with their kids or break dance with their kids." He thought the minor would be harmed if he no longer could see Father since "[i]t would be something missing in his life. It would be like a void or something. I wouldn't want to confuse him like that, you know? It would be very confusing for him to not have a dad or mother any[]more and just have the one parent, the foster parent. You can't do that to children. I think they are smart." He further stated that "we have been bonding for a long time, and I see the magic inside of him. He is very magical. He is the coolest kid on earth." Father also said he would continue to visit with the minor if the court established a guardianship.

Counsel for Mother, Father, and the minor all argued that the juvenile court should find that the parents had met their burden to show that the beneficial-relationship exception to adoption had been established and asked the juvenile court to select guardianship as the permanent plan.

The juvenile court concluded that the minor was adoptable. And it further concluded that the parents had not established the beneficial-relationship exception to adoption. According to the court, it was "absolutely not in dispute" that the parents had maintained regular contact and visitation with the minor. But the court found that the parents had failed to establish the other two prongs of the beneficial-relationship exception, as discussed in more detail below.[5] The court terminated the parental rights of Mother and Father and selected adoption as the permanent plan. Both

---

[5] The court also concluded that the sibling-bond exception to termination of parental rights had not been established, an argument that the parents do not renew on appeal.

12

parents appealed (No. A170829).  The appeals were briefed separately, and the court consolidated them for purposes of opinion.

## II.
### DISCUSSION

### A. *The Juvenile Court Did Not Abuse Its Discretion When It Denied the Parents' Section 388 Petitions (A170346).*

1.  Section 388 Principles and the Standard of Review.

Section 388 allows interested parties to petition for a hearing to change or set aside a prior order of the juvenile court on the grounds of "change of circumstances or new evidence."  (§ 388, subd. (a)(1).)  The burden of proof at any such hearing is on the moving party to show by a preponderance of the evidence *both* that there are changed circumstances or new evidence *and* that a change in court order would be in the best interest of the child.  (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.)  " '[T]he change in circumstances must be substantial' " and "must be genuine and ' "of such significant nature that it requires a setting aside or modification of the challenged prior order." ' "  (*Ibid.*)

"When, as in this case, a section 388 petition is filed after family reunification services have been terminated, the juvenile court's overriding concern is the child's best interests.  [Citation.]  The parent's interests in the care, custody and companionship of the child are no longer paramount; and the focus shifts to the needs of the child for permanency and stability."  (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1122–1123.)

We review the juvenile court's ruling on a section 388 petition for an abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)  That is, "we may not reverse unless the juvenile court exceeded the bounds of reason, and we have no authority to substitute our decision for that of the lower court

where two or more inferences can reasonably be deduced from the facts." (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1089.)

2. Father Did Not Establish that Returning the Minor to His Care Was in the Minor's Best Interest.

Father, joined by Mother, argues that the juvenile court abused its discretion when it denied his section 388 petition requesting the return of the minor to his care. Although it is beyond dispute that Father made many positive strides in his life and loves his son, we disagree that the court abused its discretion.

Father argues, and the Bureau disputes, that he demonstrated sufficient "changed circumstances" for purposes of section 388. This question sometimes turns on whether "circumstances were 'changing' but 'not changed' for purposes of section 388." (E.g., *In re N.F.* (2021) 68 Cal.App.5th 112, 119.) The juvenile court stressed that the focus was not on the changes made since the start of proceedings (which were substantial) but only on changes since the order Father sought to change (which were significant but recent). Whatever the legal standard, the court repeatedly commended Father for his progress, and we would be remiss if we did not do the same. Even on the cold record before the court, it is abundantly clear that Father has made many positive changes in his life, has taken responsibility for his past actions and their effect on his son, and has worked hard to build a support network and prepare for the possible return of the minor to his care. We assume without deciding that Father demonstrated sufficient changed circumstances for purposes of his section 388 petition.

But even where a parent has satisfied the changed-circumstances prong of section 388, we still affirm if it was not established that a change of court order would be in the minor's best interest (e.g., *In re J.C.* (2014) 226 Cal.App.4th 503, 526), the more difficult question presented here. Again,

14

where a section 388 petition has been filed after the termination of reunification services and "on the eve" of the selection-and-implementation hearing, the focus at this point is on the child's need for permanency and stability, and the juvenile court must recognize this shift when determining the best interest of the child. (*J.C.* at p. 526; see also *In re Stephanie M.*, *supra*, (1994) 7 Cal.4th at p. 317.) The juvenile court's focus here clearly was on the minor's best interest in this context. The court observed that "[w]e have a child who has been in the care of his caretaker since he was two months of age. He is now almost two and a half years old. He has never had any unsupervised visits with his parents. He experiences dysregulation that would be challenging for any parent."

Father argues that this case is analogous to *In re J.M. supra*, 50 Cal.App.5th 833, but we disagree. During the 16 months the mother received services in *J.M.* to reunite with her infant son, she moved out of the home where she had been experiencing domestic violence and was granted a 29-day visit with her son, but the visit ended early over concerns about whether the mother's living unit complied with zoning laws and whether the mother was engaging in services. (*Id.* at pp. 839, 841.) Although the mother continued to have positive visits with her son, her reunification services were terminated after she violated a no-contact order with her son's father and was arrested while traveling on a train with him. (*Id.* at pp. 840–841.) Three months after the termination of services, the mother filed a section 388 petition seeking return of her son or further reunification services after she moved into a new home and reported that she had not had contact with the father since her arrest with him the previous year. (*J.M.* at p. 842.) The juvenile court denied the request, stating it had concerns about the mother's credibility, her ability to arrange for childcare while she was working nights,

15

and her ability to take care of her special-needs child while working full time. (*Id.* at pp. 844–845.)

The *J.M.* court reversed. (*In re J.M.*, *supra*, 50 Cal.App.5th at pp. 850–851.) It acknowledged the deferential standard of review (*id.* at p. 846) and the presumption that after reunification services have been terminated, there is a rebuttable presumption that it is in the minor's best interest to continue in foster care (*id.* at p. 847). But it concluded that "this presumption cannot mean any section 388 petition is automatically doomed to fail when it seeks return of a child currently doing well in a potentially permanent placement." (*Ibid.*) The court concluded that it had been an abuse of discretion to focus on the speculative conclusion that the mother lacked training for caring for her son's special needs since there was uncontradicted evidence that she was able to care for her son and had never been required to undergo such training. (*Id.* at pp. 849–850.) Although the mother's section 388 petition had presented two alternatives (return of her child or further reunification services with overnight visits, *J.M.* at p. 842), the *J.M.* court ordered the immediate placement of the minor with his mother. (*Id.* at p. 851.)

Here, unlike in *In re J.M.*, the parents never advanced to having unsupervised visits with the minor. And the record further reveals that Father's section 388 petition was not "doomed to fail." (Cf. *In re J.M.*, *supra*, 50 Cal.App.5th at p. 847.) After hearing days of testimony, the juvenile court painstakingly summarized evidence it relied on in concluding that it would not be in the minor's best interest to be returned to Father's care. It pointed to evidence that Father did not appreciate how challenging it would be to have the minor and the younger brother returned to his care; that although Father had "an incredibly positive attitude about everything," this sometimes worked against him since he "might have a little difficulty confronting what

16

might be challenging or negative"; that although Father did not acknowledge it, it became clear Father intended to rely on Mother for child care, which was concerning because her sobriety was new and the court was "not convinced that mom is interested in resuming a babysitter role"; that the minor had been experiencing dysregulation and night terrors that the parents had not yet had the challenge of addressing; and that it would be difficult to manage the logistics of attending church and meetings as well as napping (the parents' coping mechanisms to maintain sobriety) with a high-needs child in their care. The court specifically stated that it considered *J.M.* when making its ruling, and it recognized that "parents are not expected to be perfect." We cannot conclude that any of the factors the court relied on were improper or that it was an abuse of discretion not to return the minor to either of the parents' care.

Father urges the court to weigh the factors set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532: (1) the seriousness of the problems that led to dependency, (2) the strength of the bonds to both parent and caretakers, and (3) the degree to which problems may be easily improved and the degree to which they actually have been. (Cf. *In re J.C.*, *supra*, 226 Cal.App.4th at p. 527 [*Kimberly F.* factors do not give full consideration to change in focus to minor's need for permanency and stability].) It is no doubt true that there was evidence supporting a return to Father, as he stresses on appeal: He had made great strides in maintaining sobriety, had developed a bond with his son, and had a support network of extended family members. But that evidence did not *compel* the return of the minor to his care. Father claims that many of the juvenile court's concerns about his ability to care for the minor were "speculative." But since the parents had never had the minor in their care and never advanced past supervised

17

visitation, any outcome involved a certain amount of guesswork.  Again, we cannot conclude given all the evidence that the juvenile court's weighing of all the various testimonies and other evidence amounted to an abuse of discretion.

> ### 3.  Mother Also Did Not Establish that Having the Minor Returned to Her Care Would Be in the Minor's Best Interest.

For essentially identical reasons, we likewise reject Mother's argument (joined by Father) that the juvenile court abused its discretion when it declined to return the minor to her care.  Like Father, Mother should be commended for her progress in achieving sobriety and improving her circumstances.  We assume for purposes of this appeal that she met her burden to demonstrate changed circumstances.

But we disagree with Mother that she sufficiently demonstrated that returning the minor to her care would be in his best interest such that it was an abuse of discretion to deny Mother's request.  Mother asserts that the minor was "only" two and a half at the time of the denial of her petition and that "his young age would be a favorable factor in consideration of reunification."  But when a minor is under the age of three at the time of removal, the presumption is that family reunification services will be provided for six months and not longer than 12 months from the date the child entered foster care (§ 361.5, subd. (a)(1)(B)), a legislative recognition that " 'very young children . . . require a more timely resolution of a permanent plan because of their vulnerable stage of development. . . . [G]iven the unique developmental needs of infants and toddlers, moving to permanency more quickly is critical.' " (*Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 612, quoting Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1524 (1995–1996 Reg. Sess.) as amended May 20, 1996, p. 4.)  The

18

fact the minor was under three and had never had unsupervised visits with his parents weighed *against* a finding it would be in his best interest to return to Mother's care.

Like Father, Mother claims that this case is akin to *In re J.M.*, *supra*, 50 Cal.App.5th 833, but we again disagree. True, *J.M.* stressed that denying the minor in that case "the benefit of being raised by his biological mother based on her mistakes early in the proceedings—particularly when she no longer posed a risk to him—would be to make the perfect the enemy of the good." (*Id.* at p. 848.) And it noted that though "a child's bond to foster parents is an important consideration, it 'cannot be dispositive [citation] . . . lest it create its own self-fulfilling prophecy.' " (*Id.* at p. 849, quoting *In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531.) The *J.M.* court was critical of the juvenile court for faulting the mother for not receiving training even though she was never required to do so, whereas the caregiver was adequately caring for the child despite not having received training. (*J.M.*, at pp. 844, 849–850.) In other words, there was concern about simply comparing a stable placement with a potentially flawed but adequate parent. Here, although the juvenile court correctly focused on the minor's need for stability, there is no indication that it simply compared the minor's current home with the Mother's and in doing so overlooked the potential benefits of being raised by a biological parent (or parents).

Mother notes that in *In re J.M.*, the minor had come within the jurisdiction of the court based on domestic violence issues, but then the juvenile court "devised a list of ways, wholly unrelated to any risk of domestic violence, in which [the mother] needed to prove herself as a parent in order for her to earn back her child," and deficiencies in this area would not have created a risk to the minor independently to support jurisdiction. (*In re J.M.*,

19

*supra*, 50 Cal.App.5th at p. 850.)  Mother claims that a similar dynamic was at play here, but we disagree.  The juvenile court took jurisdiction based on allegations about Mother's serious substance abuse and the fact that both parents failed to reunify with older siblings.  The juvenile court here repeatedly stressed that the parents' sobriety, though commendable, had only been recently tested outside of a controlled environment, which was directly relevant to the reason the court initially took jurisdiction.  True, the court pointed to the report that Mother had slapped the minor's hand during a visit, which would not have independently supported originally taking jurisdiction.  The court's observation about the hand slapping was part of a longer discussion about how Mother "did a great job of explaining what she had learned in her special needs class" but nonetheless did not demonstrate she had internalized everything she had been taught.  Mother represents on appeal that had she been "told or ordered not to use physical discipline," there is every reason to believe she would have complied.  But at these stage of the proceedings, the court was weighing the possibility of returning the minor to his parents' care, in which case it would have had to be satisfied that it would be in the minor's best interest to do so.  Any concern about whether Mother had internalized the parenting classes she took was a valid concern when determining the minor's best interests.

Mother points to other concerns raised by the juvenile court, such as the fact she might not be interested in being the minor's full-time caregiver, that the parents might have trouble dealing with the minor's dysregulation, and whether mother's relapse plan included the minor.  She stresses the evidence that favored her position in the juvenile court.  But we of course view the evidence in the light most favorable to the juvenile court's order.  And since the juvenile court did not give weight to any inappropriate factors,

20

we cannot conclude that the court abused its discretion in declining to return the minor to Mother's care.

### 4. The Juvenile Court Did Not Use an Incorrect Standard in Evaluating Whether to Grant Mother Reunification Services.

Mother next argues that the juvenile court applied an incorrect burden of proof when it denied her alternative request that she be granted reunification services. We again disagree.

As we have said, it was the parents' burden to demonstrate both elements of their section 388 petitions by a preponderance of the evidence. (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 845.) This is true even where a parent, such as Mother, who was initially bypassed for services later seeks such services (except in situations not applicable here). (See *In re L.S.* (2014) 230 Cal.App.4th 1183, 1194; cf. § 388, subd. (a)(2) [clear-and-convincing burden where services bypassed because parent caused death of another child (§ 361.5, subd. (b)(4)), because child under five was subject to severe physical abuse (§§ 361.5, subd. (b)(5), 300, subd. (e)), or because child suffered severe sexual abuse or physical harm (§ 361.5, subd. (b)(6))].)

During her closing argument, counsel for the Bureau argued that it was not in the minor's best interest to be returned to Mother. And counsel further argued that "the law does not allow for it," since the proceedings had already exceeded 24 months, the maximum amount of time services may be provided. Although counsel did not identify the correct statute number, she clearly was referring to section 361.5, subdivision (a)(4)(A), which requires a showing of likelihood that the child will be returned to the parent within the extended period of services if services are extended to 24 months, as well as the fact the services would be in the child's best interests. Counsel concluded her argument by stating, "And there is just not enough evidence for this

21

Court to say that if we gave [M]other more services, or gave services at all, that she would be able to reunify with this child within the time given. [¶] And this child, who has spent almost two and a half years out of the care of his parents, it would not be in his best interest to be returned to either parent or both."

The juvenile court spoke at length when issuing its ruling. It first commended the parents for the progress they had made. The court then noted that it had "spent a great deal of time researching and preparing for this case, looking for similar fact patterns in the law." It proceeded to summarize the applicable law as well as discuss several specific cases, including ones cited by the parties. The court pointed to *In re L.S.*, *supra*, 230 Cal.App.4th 1183, regarding section 388 petitions requesting services that were previously bypassed to a parent. The court noted that *L.S.* "did confirm that even though services for mom had been bypassed because of the provisions that she was bypassed on, she is still being held to a preponderance standard, not clear and convincing." It later addressed the Bureau's argument that considering the time frame, the court "would have to find exceptional circumstances and make some findings" in order to "extend services to mom." The court stated that it likely did have discretion to extend services, but it "agree[d] that [it] would have to make specific findings."

After summarizing the applicable law, the court turned to the specific section 388 petitions before it, stating, "Moving to the 388's . . . ." As part of its analysis of the parents' specific requests, the court stated that "I very much did consider extending services for another six months to [M]other. While I know the Bureau disagrees, I do think the balance of the case law in this area would at least give the Court the discretion through [section] 352 [regarding continuances in dependency cases] to extend services. However,

22

those reasons have to be exceptional, and so I am not exercising that discretion because I do not believe that that—the facts in this case indicate exceptional circumstances. [¶] I am not exercising that discretion because of just how young [the minor] is and how long permanency has already been delayed, and the fact that parents have been on notice of many of the issues that I have raised for some time, and have yet to address them. And so I do not have confidence that they would be able to address them in an expeditious manner which is what [the minor] deserves."

Mother relies on the foregoing statements and claims that, although the juvenile court did specifically refer to the statute, the court improperly required Mother to meet the statutory elements for extending court-ordered services to 24 months (§ 361.5, subd. (a)(4)(A)). Mother claims that the court's reference to "extending" services to Mother meant the court "erroneously believed the mother had been provided 18 months of services." To the contrary, the court specifically noted in its summary of the law that "*services for mom had been bypassed because of the provisions that she was bypassed on*."[6] (Italics added.)

Mother also misleadingly points to the court's transition statement from its general discussion of the law regarding extending reunification services to the discussion of the parents' particular requests ("Moving to the 388's . . . ."). Mother claims "[i]t is apparent from those four words that the court had moved on" from the request to reunification services to the request for a return of the minor to parental custody. To the contrary, it was not until much later in the court's ruling that it stated it "very much did consider

_____

[6] Although this statement was made during the court's discussion of *In re L.S.*, *supra*, 230 Cal.App.4th 1183, it is clear the court was referring to Mother in this case and not to the parties in *L.S.*, since *L.S.* (unlike here) involved two parents who had been bypassed for services. (*L.S.* at p. 1192.)

extending services" to Mother and addressed that specific request. In sum, the record does not support Mother's claim that the court misunderstood what relief Mother sought or applied the wrong standard of proof.

Even if the juvenile court had somehow applied the wrong standard—despite acknowledging that Mother's burden under section 388 to seek services after previously having been bypassed was a preponderance of the evidence—Mother does not clearly articulate how she was possibly prejudiced by the alleged error. True enough, the juvenile court stated it did not find that "exceptional circumstances" warranted ordering services for Mother. But at this stage in the proceedings—on the eve of the selection-and-implementation hearing and more than two years after removal—such extraordinary circumstances would indeed have been necessary to delay permanency for the minor. In other words, just because Mother's burden of proof was low does not mean that what she had to prove under that burden was insignificant. Specifically, she had to show that any change in order would be in the minor's best interest. On appeal, Mother summarizes all the evidence favorable to her position, but she falls short, as she did below, of demonstrating that the evidence compelled a finding that providing reunification services was in the minor's best interest.

### B. The Juvenile Court Did Not Err When It Terminated Parents' Parental Rights (A170829).

In appeal No. A170829, Father argues that the juvenile court erred in terminating his parental rights since he established the existence of a beneficial child-parent relationship. Although we again acknowledge that Father made great strides in his life and clearly loves and is devoted to his young son, we disagree that the juvenile court erred.

24

The goal of a hearing held under section 366.26 is to select and implement a permanent plan for the minor. (See *In re Caden C.* (2021) 11 Cal.5th 614, 630.) If reunification services have been terminated and the court finds by clear-and-convincing evidence that the child is likely to be adopted, the court shall terminate parental rights unless the parent shows that termination would be detrimental to the minor for at least one statutorily enumerated reason. (*Id.* at pp. 630–631; see § 366.26, subd. (c)(1)(B)(i)–(vi).) The provision at issue here applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

A parent must prove three elements to establish that the beneficial-relationship exception to adoption applies: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C., supra*, 11 Cal.5th at p. 631.) We review the first two elements (regular visitation and whether the child would benefit from a continuing relationship) for substantial evidence and the third element (whether termination of parental rights would be detrimental to the child) for an abuse of discretion. (*Id.* at pp. 639–640.)

The juvenile court found, and the Bureau does not dispute on appeal, that Father demonstrated the first prong of the beneficial-relationship exception, that he had regular visitation and contact with the minor. Father challenges the juvenile court's finding on the second prong of the exception: whether the minor would benefit from continuing their relationship. In evaluating this element, "the focus is the child. And the relationship may be

25

shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.] Certainly, it is not necessary—even if it were possible— to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' " (*Caden C.* at p. 632.)

In concluding that Father had not met his burden to prove the second prong, the juvenile court emphasized that "I want the parents to understand that, of course, I see—and a lot of evidence has been presented about the parents' attachment to [the minor]. But for the purposes of a legal analysis, the attachment has to be shown from [the minor] to the parents, from his perspective." The court analyzed some of the relevant factors set forth in *In re Autumn H.*, *supra*, 27 Cal.App.4th 567: the minor was two and a half years old, which was "still very young"; he had never lived with his parents and thus never had an opportunity to bond with them before he was removed from their care; and he had never known life with them as caregivers. The court considered this latter factor important, since cases where the beneficial-relationship exception applies tend to involve children older than the minor in this case. The court also noted the evidence that the minor appeared overstimulated and dysregulated after visits with the parents, and that those behaviors decreased when visits were reduced. And while the minor

appeared attached to Father during visits, the court considered it a "significant factor" that the minor was not distressed when visits ended. Whereas case law cited by the parties focused on children who were sad when visits ended, here "both the verbal and physical manifestations of [the minor] in his desire to go into the visits and to leave the visits don't indicate that he was distressed about their ending. We don't have that here. The other significant piece of evidence that we have of detriment, or lack thereof, is the evidence that when the visits were reduced, [the minor]'s problematic behaviors appeared to lessen." The court correctly applied the legal standards, and its findings are supported by substantial evidence.

On appeal, Father highlights all the evidence showing the positive relationship he had with his young son. There is no denying that, as Father puts it, he "establish[ed] a positive, substantial emotional attachment" with his son over the course of the two and a half years of the minor's life. But we of course "review the evidence in the light most favorable to the juvenile court's findings and draw all reasonable inferences in support of those findings." (*In re M.G.* (2022) 80 Cal.App.5th 836, 848.) We are required under the substantial-evidence standard of review to affirm if *any* substantial evidence, whether or not contradicted, supports the court's order, and we resolve all conflicts in favor of the order terminating parental rights. (*Ibid.*) Under this standard, substantial evidence supports the juvenile court's ruling. Because the court did not err in evaluating the second element of the beneficial-relationship exception, we reject Father's argument that error "infect[ed]" its assessment of the third element. (Cf. *id.* at p. 852 [where substantial evidence did not support the second element, it was unnecessary to review juvenile court's finding on third element and reversal was required].)

Mother's sole argument in A170829 is that if the court reverses the order terminating parental rights as to Father, it should also reverse the order as to Mother since adoption would no longer be the permanent plan. Because we affirm as to Father, we affirm as to Mother as well.

### III.
### DISPOSITION

In A170346, the order denying the parents' petitions under section 388 is affirmed.

In A170829, the order terminating parental rights is affirmed.

_____

Humes, P.J.


WE CONCUR:


_____

Banke, J.


_____

Smiley, J.


*In re Baby Boy A.*  A170346, A170829